UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | | |
|---|---|---|
| LYNN CORON, | ) | |
| | ) | |
|    *Plaintiff*, | ) | |
| v. | ) | No. 2:05-cv-05 |
| | ) | *R. Allan Edgar* |
| JOHN A. SANDIN, III, M.D., | ) | |
| | ) | |
|    *Defendants*. | ) | |

**MEMORANDUM**

Plaintiff Lynn Coron, a resident of Michigan, brings this action against Dr. John A. Sandin, III, a Wisconsin resident and a neurosurgeon, for breach of a contract relating to back surgery Dr. Sandin performed on her. This Court has jurisdiction based on the diversity of citizenship of the parties and because the amount in controversy exceeds seventy-five thousand dollars. 28 U.S.C. § 1332.

Defendant moves for summary judgment on plaintiff's breach of contract claims. [Court Doc. No. 17]. Plaintiff opposes the motion for summary judgment. [Court Doc. No. 23]. After reviewing the record in the light most favorable to plaintiff, the Court concludes that Dr. Sandin's motion will be **DENIED**.

    **I.**    **Background**

The facts, seen in the light most favorable to the plaintiff, are as follows. Plaintiff Coron has a history of back problems reaching back as early as 1993. Ms. Coron has a degree as a Licensed Practical Nurse ("LPN"). *See* [Court Doc. No. 1-1]. She worked as an assistant home supervisor at Gogebic County Community Mental Health Center in Wakefield, Michigan from

1992 until 2003. *Id.* Her job entailed taking care of individuals, called consumers, in need of physical and medical care. [Court Doc. No. 23-2, Deposition of Lynn Coron ("Coron Dep."), p. 14]. As plaintiff described her job, "most of the day was dealing with the consumers, either feeding them, or cooking for them, or doing laundry, putting supplies away with them in their rooms, picking their clothes out with them, we're always dealing with them." *Id.* Ms. Coron, with the assistance of another aide, also regularly helped lift a consumer weighing 150 pounds to transfer him or her to another location. *Id.* at pp. 11-12.

Ms. Coron began experiencing back pain in 1993, and saw her personal physician who prescribed anti-inflammatories. Coron Dep., p. 18. This approach helped her for years, but her job activities exacerbated her condition. *Id.* at 18, 22. After her personal physician became too busy to see her, Ms. Coron began seeing a nurse practitioner to provide care for her back condition. *Id.* at 18. Ms. Coron saw several other physicians over the years about her condition. Her nurse practitioner finally recommended that Ms. Coron see defendant Sandin about her back problems.

Ms. Coron first saw Dr. Sandin, who was living and practicing medicine in Michigan at the time, on July 17, 2002. Coron Dep., p. 26. Dr. Sandin noted in a letter dated the same day that "[r]adiographs of the lumbar spine reveal lateral recess stenosis at L4-L5 with a right mild disk bulge at L5-S1. In addition, she has changes of degenerative disk disease at L4-L5 and L5-S1 on her sagittal MRI." [Court Doc. No. 23-3, p. 9]. On July 30, 2002 Dr. Sandin noted in another letter:

> I discussed with [plaintiff] and her husband, surgical options. I believe that it
> would be prudent to use a trial of rigid bracing to accomplish some spinal stability
> before engaging in an operative procedure. They understood this when they left

>  my clinic; however, when they got to [the brace provider], they decided that Ms.
>  Coron could not work in the TLSO brace, which I had prescribed.  I am not sure
>  where we are going to go from here.  I believe her work is of a hard labor type that
>  aggravates her pain.  I believe it will be hard to reach relief while doing this kind
>  of work.

*Id.* at 11.  On August 21, 2002 Dr. Sandin's letter to another doctor regarding Ms. Coron indicates that Ms. Coron was willing to try the brace even though she believed she could not perform her work while wearing it.  *Id.* at 12.  Dr. Sandin also noted that he discussed "surgical procedures" with Ms. Coron.  *Id.*  In a letter dated October 2, 2002, Dr. Sandin noted that he "went on to frankly discuss with [plaintiff] that the whole idea behind the brace is if her pain can be relieved with bracing, we will go ahead and do an operation which would be the equivalent of internal bracing.  If not, I will not be able to help her and likely she will need some sort of treatment by a pain center."  *Id.* at 13.  On May 13, 2003 Dr. Sandin wrote that he discussed with Ms. Coron "anterior lumbar interbody fusion at these levels supplemented by a dorsal pedicle screw placement using a percutaneous technique.  I discussed both the risk and benefits and she would like to proceed as soon as we can schedule it in June."  *Id.* at 14.

It is at this point that the stories of the parties diverge.  The parties agree that Dr. Sandin met with Ms. Coron and her husband on May 13, 2003.  Ms. Coron recalls that, either at that meeting or at some other time in the weeks before her surgery, Dr. Sandin informed her that "he would make [her] a hundred percent and make [her] feel better than [she] ever ha[d] in [her] life."  Coron Dep., p. 37.  Dr. Sandin also allegedly informed her that she would have "minimal blood loss, minimum days in the hospital."  *Id.*  Ms. Coron has no recollection of Dr. Sandin discussing the risks of surgery with her.  *Id.* at 39.  Ms. Coron's husband concurs with Ms. Coron's recollection that Dr. Sandin did not discuss the risks of surgery but that he did "say that

3

she would be a hundred percent pain free and live a normal life with [him]." [Court Doc. 23-4, Deposition of Larry Coron ("L. Coron Dep."), p. 8].

Dr. Sandin's version of the oral meeting is markedly different from Mr. and Ms. Coron's version. Dr. Sandin testified in his deposition that he did not make any guarantee to Ms. Coron regarding the results of her surgery. [Court Doc. No. 23-6, Videotape Deposition of John Sandin, M.D. ("Sandin Dep."), p. 70]. Dr. Sandin testified that he "did not tell [Ms. Coron] that she would be 100 percent or 100 percent better." *Id.* at 73. He further testified that he discussed the risks and benefits of surgery with Ms. Coron. *Id.* at 72. Dr. Sandin expected that Ms. Coron's condition would improve. *Id.* at 71, 72. Because Dr. Sandin brings a motion for summary judgment, this Court will assume that Ms. Coron's version of the May 13, 2002 meeting is correct.

Following their meeting on May 13, 2002, Ms. Coron wrote Dr. Sandin a note dated May 16, 2002 with some additional questions about her surgery. She testified that she wrote the note because she:

> wanted to be sure that he said I'd be a hundred percent and be able to go back to work. I wanted to be sure, again, that that's the way it would be. I was so nervous about surgery, I wanted to make sure I'd be able to go back to work and I'd be a hundred percent.

Coron Dep., p. 42. Dr. Sandin provided handwritten responses to Ms. Coron's questions and signed his name at the bottom of the note. The note, with Ms. Coron's questions and Dr. Sandin's responses in bold, stated:

> Dear Dr. Sandin,
>     Would you please respond to my questions ASAP, about my surgery. I thought of more after our visit:
> (1) Will I be able to work at the same job I'm at now. It requires a lot of

4

    turning/repositioning of people, bathing people & lifting 50+ lbs.?  How much
will I be able to lift?
**Yes!**
(2) Will I need physical therapy?  How often?
**I always make it available, participation is your choice.**
(3) After the recovery period, will I be able to return to normal activity? or will I always have back "trouble"?
**Should return to normal**
(4) What will my restrictions be after surgery?  Riding in cars?  Driving? Housekeeping?
**No lifting, pushing, pulling, draging** [sic] **over 30#s.**
Thank you for your time.

    **J. Sandin**    Sincerely,
                      Lynn Coron

[Court Doc. No. 23-5].  Ms. Coron asserts that she consented to have the back surgery based on Dr. Sandin's written responses to her questions.  Coron Dep., pp. 90-92; L. Coron Dep., p. 10.

Ms. Coron signed two patient admission forms at the hospital prior to her back surgery.  Coron Dep., p. 50.  She testified that she did not read these documents. *Id.* at 82.  The Marquette General Hospital Patient Admission Consent form asked Ms. Coron to certify that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as to the results of said hospital care and medical treatment which I have authorized."  [Court Doc. No. 23-7].  Ms. Coron also signed a hospital form confirming that "the general purpose, potential benefits, possible risks, complications, and inconveniences of the procedure have been explained to my satisfaction by my physician or care provider, and the alternatives have been discussed. . . . I understand there is no guarantee that any particular result will be obtained."  [Court Doc. No. 23-8].

Unfortunately, the back surgery did not alleviate Ms. Coron's symptoms.  She admits that the parts of her spine upon which Dr. Sandin operated have fused together as expected by the

surgery. Coron Dep., p. 49. However, she has not obtained any relief from the surgery and has been unable to return to work at all since the surgery. *Id.* at 55. Ms. Coron testified that as of June 22, 2005 she still had " a considerable amount of pain." *Id.* at 70. She alleged that she "can't sit long, . . . stand long, walk long, [she] can't bend." *Id.* Her doctor allegedly informed her that she would not be able to lift more than ten pounds for the rest of her life. *Id.* She was still going to a pain management clinic in an attempt to handle the continuing pain she felt. *Id.*

In September of 2003, following the performance of surgery on Ms. Coron in June of 2003, Dr. Sandin needed emergency surgery to remove a malignant brain tumor. Sandin Dep., pp. 10, 14. Although Ms. Coron mentions Dr. Sandin's competency in performing surgery on her back and his subsequent brain tumor, this is not a case of malpractice based on negligence. Nor does Ms. Coron allege that Dr. Sandin failed to perform surgery on her back in a competent manner. Thus, this Court does not consider facts raised regarding Dr. Sandin's own medical condition as relevant to this breach of contract action.

## II.   Standard of Review

The Court's jurisdiction in this action is based on diversity; therefore, the Court must apply federal procedural law and Michigan substantive law. This Court will apply the federal standard relating to a motion for summary judgment. *See Dolly v. Old Republic Ins. Co.*, 200 F.Supp.2d 823, 829 (N.D. Ohio 2002); *Gafford v. General Elec. Co.*, 997 F.2d 150, 165-66 (6th Cir. 1993).

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the

6

Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**III.     Analysis**

Ms. Coron claims that Dr. Sandin's written responses to her questions, combined with her understanding that he orally promised to make her one hundred percent better, constitutes an express contract.  The parties were living in Michigan at the time they created the alleged contract, and they agree that Michigan law applies in this action.

In *Guilmet v. Campbell*, a case decided before the Michigan legislature adopted the statute of frauds for warranties of cure and agreements pertaining to medical treatment, the Michigan Supreme Court addressed an alleged oral warranty of cure.  188 N.W.2d 601 (Mich. 1971).  The plaintiff in that case testified that the defendant physician told him that "'once you have an operation, it takes care of all of your troubles.'"  The plaintiff also alleged that the physician said that "'[y]ou can eat as you want to, you can drink as you want to, you can go as you please." *Id.* at 603.  The doctor also told him that there "is no danger at all in this operation." *Id.*  Despite these assurances, the plaintiff suffered great damages following the surgery. *Id.* at 604.  Plaintiff claimed defendant's statements constituted a contract for cure.

The court in *Guilmet* noted that "[i]n this state, a doctor is free to contract as he sees fit.  He may or may not warrant the results of his treatment.  He may do so as a term of the contract or as a separate contract subsequent to the original contract." 188 N.W.2d at 606 n.1 (citing *Stewart v. Rudner*, 84 N.W.2d 816 (Mich. 1957)).  The court concluded:

> We hold that the terms of a contract, when contested, are for the jury's determination.  This is true even when the evidence of the terms is uncontradicted. . . . We recognize that what we hold is sometimes made clearer by stating what we do not hold.  Here we do not say that everytime a doctor says to his patient prior to the formation of their contract for example, 'I recommend an immediate appendectomy.  It will fix you up fine.  You will be back to work in no time.  Do not worry about it–I have done hundreds of these operations.  It is really a very

8

> simple thing.' [sic]  It may be said that he contracted to 'cure' his patient.  What we are saying is that under some circumstances the trier of fact might conclude that a doctor so speaking did contract to 'cure' his patient.  What was said, and the circumstances under which it was said always determines whether there was a contract at all and if so that [sic] it was.  These matters are always for the determination of the fact finder.

*Guilmet*, 188 N.W.2d at 606.  The court also noted that "to find for the plaintiffs here the jury must have found from the evidence that the doctors made a specific, clear and express promise to cure or effect a specific result which was in the reasonable contemplation of both themselves and the plaintiff which was relied upon by the plaintiff." *Id.* at 607.  The court held that, based on the circumstances, it was appropriate to send the case for breach of contract to the jury.  *Id.*

In *Stewart*, a case relied on by the court in *Guilmet*, the court cautioned that "with respect to the contracts of physicians, . . . certain qualitative differences should be observed, since the doctor's therapeutic reassurance that his patient will be all right, not to worry, must not be converted into a binding promise by the disappointed or quarrelsome." 84 N.W.2d at 823.

In 1974, subsequent to the decision in *Guilmet*, the Michigan legislature amended the statute of frauds, to include a section pertaining to warranties of cure and agreements relating to medical treatment.  MICH. COMP. LAWS ANN. § 566.132 (1996); *see Bucalo v. Board of Regents of the Univ. of Mich.*, 434 N.W.2d 413 (Mich. 1989).  The statute states in pertinent part:

> (1) In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise: . . .
> (g) An agreement, promise, contract, or warranty of cure relating to medical care or treatment.  This subdivision does not affect the right to sue for malpractice or negligence.

MICH. COMP. LAWS ANN. § 566.132(g).  Several Michigan courts have applied this statutory

9

provision to "agreements for medical treatment, and ha[ve] not restricted the application of this statute to 'warranties of cure.'" *Smith v. City of Pontiac*, 426 N.W.2d 704, 705-06 (Mich. Ct. App. 1988) (citing *Gilmore v. O'Sullivan*, 307 N.W.2d 695 (Mich. Ct. App. 1981)); *Malik v. William Beaumont Hosp.*, 423 N.W.2d 920, 925 (Mich. Ct. App. 1988).

Michigan courts have reviewed cases in which the writing was insufficient to satisfy the statute of frauds. For example, in *Malik* the court determined that a hospital staff memorandum that stated a "ninety-percent chance of success following a living-related donor transplant" and information learned in a psychological evaluation prior to the operation and transplant were insufficient to "establish that defendants had promised to improve the quality of [the organ recipient's] life." 423 N.W.2d at 925.

In *Gilmore* the appellate court addressed a situation in which the plaintiffs claimed the defendant physician agreed to perform a birth by Caesarean section. 307 N.W.2d at 696. The court noted that other Michigan courts addressing whether other types of contracts satisfied the statute of frauds required that the "writing must contain all of the essential terms of the contract . . ." *Id.* at 697-98 (citing *Ass'n of Hebrew Teachers v. Jewish Welfare Federation*, 233 N.W.2d 184 (1975)). However, the court also cited a Michigan Supreme Court decision indicating that under the statute of frauds, a writing " 'is sufficient if the obligations of each party may be determined from it. It need not have the minutiae of a contract.' " *Gilmore*, 307 N.W.2d at 698 (quoting *Fothergill v. McKay Press*, 106 N.W.2d 215 (1960)). In *Gilmore* the court held that despite several medical records indicating that the parties' contemplated that the delivery be by Caesarean section, the records did not demonstrate that the defendant obligated himself to perform such a delivery. 307 N.W.2d at 698.

In other cases, Michigan courts have shed light on writings that are sufficient to establish a contract under the statute of frauds. In *Goslin v. Goslin* the Michigan Supreme Court addressed whether two receipts containing information pertaining to the purchase price and payments on a family farm satisfied the statute of frauds. 120 N.W.2d 242, 243 (Mich. 1963). The receipts were signed by the parties and included records of payments, balance due, and a legal description of the property. *Id.* The court held that the two receipts satisfied the statute of frauds, relying on Corbin on Contracts, Vol. 2, § 498, p. 683:

> Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine: There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence. Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found.

*Id.* at 244.

In *Opdyke Investment Co. v. Norris Grain Co.*, the Michigan Supreme Court determined that the parties' letter of intent regarding construction of a stadium satisfied the statute of frauds. 320 N.W.2d 836, 842 (Mich. 1982). The court noted that:

> [w]hether the parties intend to be bound only by a formally written and executed final document is a question of fact, not a question of law; in most cases the question is properly left to the jury . . . Summary judgment is rarely appropriate where 'motive and intent play leading roles.' . . . 'If there is ambiguity, this is not a case for accelerated or summary judgment.'

*Id.* at 839 (citations and quotations omitted). The court in *Opdyke* also reviewed other Michigan cases regarding whether parol evidence could be used to interpret an alleged contract and determined that "[t]he foregoing cases establish the principle that extrinsic evidence may be used

11

to supplement, but not contradict, the terms of the written agreement." *Id.* at 841.  The court declined to "adopt narrow and rigid rules for compliance with the statute of frauds" and noted that only "essential" contractual terms need to be included in a writing.  *Id.* at 841-42.  A signed "note or memorandum" is sufficient.  *Id.* at 841 (citing *Kerner v. Hughes Tool Co.*, 56 Cal.App.3d 924, 128 Cal.Rptr. 839 (1976)).  In *Adell Broadcasting Corp. v. Cablevision Indus.* the district court, applying Michigan law, held that a check endorsed and deposited by one of the parties indicating that it was for "cable equipment" satisfied the statute of frauds that some agreement for at least "part-time, selective broadcasting" existed.  854 F.Supp. 1280, 1291 (E.D. Mich. 1994).

In the recent case of *Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus. Products, Inc.*, the appellate court concluded that despite the suggestion in *Opdyke* that a writing must contain all essential terms of a contract, the *Goslin* rule applied.  693 N.W.2d 394, 398 n.1 (Mich. Ct. App. 2005).  That court noted that letters, account statements, drafts, notes, or checks all may satisfy the statute of frauds.  *Id.* at 399.  It held that the omission of some terms of the agreement, including consideration, from the writings signed by the parties did not make the writings fail to satisfy the statute of frauds.  *Id.* at 400.

In this action the Court recognizes that the facts are ambiguous.  However, the Court must take the facts in the light most favorable to the plaintiff and assume that her version of the events is correct.  Further, this Court considers parol evidence to supplement the terms of the written agreement.  *Opdyke Investment Co.*, 320 N.W.2d at 841.  This evidence includes the allegation that Dr. Sandin informed the Corons that Ms. Coron would be made "one hundred percent" better.  Such evidence, combined with Dr. Sandin's written responses to Ms. Coron's questions

create an issue of fact regarding whether a contract existed between the parties. Dr. Sandin's emphatic "Yes!" written and signed in response to Ms. Coron's question about being able to work at her same position following surgery could be interpreted as establishing an obligation to provide medical treatment sufficient to allow her to resume her employment without pain. The Court does not suggest that this is enough to establish a binding promise, only that it is ambiguous, and where the facts are ambiguous, Michigan law directs that the question should go to the jury. *Id.* at 839.

Further, the Court concludes that plaintiff's signature on the Marquette General Hospital forms do not negate the possibility that Ms. Coron and Dr. Sandin established a separate agreement. The forms indicate a contract between Ms. Coron and Marquette General Hospital, not between Ms. Coron and Dr. Sandin. [Court Doc. Nos. 23-7, 23-8].

Michigan courts have directed that the statute of frauds need not apply rigidly, but that a writing will suffice where it has "substantial probative value in establishing the contract must exist." *Goslin*, 120 N.W.2d at 244. The Court concludes that Dr. Sandin's signed handwritten responses to Ms. Coron's questions, combined with other parol evidence, may be enough to convince a jury that a contract regarding treatment of Ms. Coron's back existed between the parties. Therefore, Dr. Sandin's motion for summary judgment will be **DENIED**.

## IV. Conclusion

After reviewing the record and the applicable law, the Court concludes that a genuine issue of material fact exists regarding whether the parties formed a contract relating to the treatment of Ms. Coron's back condition. Therefore defendant's motion for summary judgment on plaintiff's breach of contract claims under Michigan law will be **DENIED**.

A separate order will enter.

Dated: 6/21/06  /s/ R. Allan Edgar
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE